**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GRATIA LEGER,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **No. 05-CV-3741** |
| | : | |
| **JO ANNE BARNHART,** | : | |
| **Commissioner of Social Security,** | : | |
| **Defendant** | : | |

## REPORT AND RECOMMENDATION

**TIMOTHY R. RICE**
**U.S. MAGISTRATE JUDGE**

This case involves plaintiff Gratia Leger's ten-year odyssey navigating the search for

Social Security benefits.  After several remands, three separate administrative hearings, and three

decisions by two Administrative Law Judges ("ALJ's"), Leger seeks judicial review of the final

decision of the Commissioner of Social Security denying her benefits.  For the following reasons,

I respectfully recommend plaintiff's motion for summary judgment be DENIED, and defendant's

motion for summary judgment be GRANTED.

The ALJ properly discounted Leger's subjective complaints of disabling pain and fatigue,

and the opinion of Leger's treating rheumatologist.  Substantial evidence supports the ALJ's

finding that despite Leger's severe impairments, she could return to her past relevant work, and

could perform such activity on a regular and continuing basis.

## PROCEDURAL HISTORY

Leger filed applications for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") on July 16, 1996, alleging disability beginning February 1, 1993,[1] due to

---

[1]  In correspondence with the ALJ, counsel amended Leger's onset date to October 31,

(continued...)

a "succession of significant injuries in a short time (neck, lower back, shoulder, and wrist) and fibromyalgia[2] brought on by [a motor vehicle accident] in 1992." (Tr. 235-37, 259). The state agency denied Leger's applications, finding Leger had no severe impairments. (Tr. 127-29, 157-61, 163-65, 811-14).

On April 26, 1999, before a scheduled hearing, the ALJ remanded the case to the state agency for evaluation of Leger's mental impairment. (Tr. 130-32, 815-17). After reconsideration of the evidence, the state agency again found Leger had no severe physical or mental impairment, and denied Leger's claims on December 22, 1999. (Tr. 133-34, 179-81, 823-24).

The ALJ conducted a hearing on August 25, 2000, and heard testimony from Leger, who was represented by counsel, and a vocational expert. (Tr. 22, 138). On November 20, 2000, the ALJ determined Leger's impairments were not severe, and denied Leger's claims for benefits. (Tr. 22, 138-53). The ALJ also completed a Psychiatric Review Technique Form ("PRTF"), and appended it to his decision. (Tr. 146-153). However, on January 16, 2002, the Appeals Council remanded the case for further proceedings, including re-evaluating the existing evidence, securing additional evidence of Leger's physical and mental impairments, and obtaining, if necessary, testimony from a medical expert and a vocational expert. (Tr. 194-97).

On October 31, 2002, following a second hearing, the ALJ determined Leger had severe

---

[1](...continued)
1995, the day after she was forced to terminate her employment. (Tr. 176-178). Leger's date of last insured for DIB purposes was June 30, 1999. (Tr. 56).

[2] Fibromyalgia may be induced or intensified by physical or mental stress, poor sleep, or trauma. It is likely to occur in healthy young or middle-aged women who tend to be stressed, tense, depressed, anxious, and striving. The Merck Manual, 481 (17th Ed. 1999).

impairments but could still perform a range of light work.  (Tr. 35-43).  However, on August 18,

2003, the Appeals Council found the ALJ failed to properly evaluate Leger's credibility and her

alleged mental impairment, and remanded the case to a different ALJ.  (Tr. 221-23).

On December 8, 2003, the newly-assigned ALJ conducted a hearing, at which Leger, who

was represented by counsel, and a vocational expert, testified.  (Tr. 22, 54-126).  The ALJ found

Leger could perform her past relevant work, and was therefore not disabled.  (Tr. 21-30).  The

Appeals Council denied Leger's request for review.  (Tr. 9-11).  Having exhausted her

administrative remedies, this petition followed.

## FACTUAL HISTORY

A.    Background

Leger was born on May 31, 1959, and was 44 years old on the date of the ALJ's decision.

(Tr. 23, 62, 235).  She received a Master's degree in European history in 1983, (Tr. 65-66), and

became a full-time doctoral student for several years.  (Tr. 91).  Her sporadic past work history

began in 1989 and lasted until 1992,[3] and included jobs as a bookstore assistant manager,

freelance writer, temporary office worker, telemarketer, research assistant, and library accessor.

(Tr. 62, 263).  Leger never married and has no children.  After several years of living alone, she

moved in with her mother when her mother's health deteriorated.  (Tr. 64-65).

Leger injured her back at work in 1992, and received worker's compensation until

sometime in 1993 when an independent physician opined Leger could resume work.  (Tr. 66-67,

259).  Her parents have also supported her financially throughout the years.  (Tr. 68).  When her

---

[3]  Leger had a part-time job as a telemarketer for approximately six months in 1995.  (Tr. 80).  Although the company told her she was being laid off for business reasons, Leger maintains she was fired because of her poor health.  (Tr. 81, 117).

father died in 1999, he left her $137,000 in stock funds and a 50 percent share in a parcel of land in Mississippi.  (Tr. 68-69).

Leger has also been involved in eight motor vehicle accidents since November 1990.  (Tr. 71-76).  These have resulted in lumbar sprains and strains, neck injuries, whiplash, concussion, and minor cervical sprains and strains.[4]

Leger also claims to have suffered elbow and shoulder injuries after falling in a puddle of water at a supermarket in Mississippi in December 1997.  (Tr. 403-05, 416).  Two days later, she went to the emergency room with complaints of left arm pain and numbness, and neck pain.  (Tr. 404).  X-rays were negative.  (Tr. 405).

B.    Hearing Testimony

At the most recent hearing, Leger said she believed she could no longer work due to her fibromyalgia and vestibular dysfunction (disturbance of the body's balance system in the inner ear).  (Tr. 86).  Leger described the multi-step process she developed out of necessity for doing her laundry, cooking, and grocery shopping.  (Tr. 99-101).  When she is feeling able, she attends church services and reads.  (Tr. 102).  She said she could walk approximately a half block before the pain begins, stand for a couple of minutes without pain, sit for approximately five minutes before pain, and lift only three to four pounds without pain.  (Tr. 103-104, 115).  Initially, Leger said her condition has remained the same since the onset of her condition.  (Tr. 105).  Later, she described how over the years her level of pain has decreased, while her level of fatigue has

_____

[4] So far, Leger brought civil suits in four of the eight accidents, and received more than ten thousand dollars, after counsel fees, in settlements.  (Tr. 73, 74).  Two of the cases are still pending.  Leger is not certain whether she will file suit in the most recent accident.  (Tr. 76).  She decided not to file suit in the remaining three accidents.

increased.  (Tr. 119-120).  Leger estimated she can function for only two hours a day.  (Tr. 120).

A vocational expert testified Leger had two jobs which could be classified as past relevant work.  The first, bookstore manager, is usually classified as semiskilled light exertional work, but which Leger described as medium exertional.  (Tr. 124).  The second, telemarketing, is semiskilled sedentary exertional work.  Id.  The vocational expert also testified nothing in the mental health evidence would preclude Leger from performing the telemarketing job or the bookstore manager job.  (Tr. 125).  However, the vocational expert agreed if the ALJ were to fully credit Leger's testimony, all work would be precluded.  Id.

C.    Medical Evidence

An MRI of Leger's lumbar spine in December 1991 showed a small central disc protrusion at L4-5, with mild to moderate degenerative disc disease.  (Tr. 393).  An MRI of Leger's cervical spine in March 1994 revealed a small central disc bulge at the C5-6 level.  (Tr. 392).

Beginning in 1995, Leger sought treatment from Dr. Thomas J. Whalen, a rheumatologist, who upon evaluation found Leger had decreased range of motion of the cervical and lumbar spine, multiple trigger points, but no neurological deficits.  (Tr. 454).  Dr. Whalen diagnosed cervical strains and sprains, fibromyalgia, lumbar strains and sprains, and equilibrium difficulty.  Id.

On April 18, 1997, Dr. Whalen completed a form for the Commissioner describing Leger's treatment for fibromyalgia and osteoarthritis which included physical therapy, pain medication, and muscle relaxants.  (Tr. 373).  He noted the pain in her neck and shoulder was exacerbated by increased activity, but her sensation, reflexes, station, and gait were within

normal limits.  There was slight atrophy of her shoulder and upper extremities.  Dr. Whalen said Leger's prognosis was poor, she would experience intermittent flare-ups, and could expect to require steroid injections, increased pain medication, and ongoing physical therapy.  (Tr. 375).

A year later, Dr. Eugene McNally of the Rehability Center assessed Leger with normal passive range of motion of the cervical spine, normal strength in both upper extremities, unremarkable neurological status in both upper extremities, normal gait, and minimum tender spots upon palpation.  (Tr. 430).  He recommended heat, soft tissue mobilization, and ultrasound treatment.  Dr. McNally characterized Leger's rehabilitation potential as "excellent."  Id.

In the spring of 1998, Leger sought treatment from Dr. John J. McCloskey, a neurological and spinal surgeon.  (Tr. 416-423).  Leger complained of neck, left shoulder, and arm pain, along with intermittent numbness and tingling in both arms and hands resulting from the slip and fall in the supermarket the previous December.  An x-ray and MRI of Leger's cervical spine showed degenerative disc disease at C5-6, with disc bulge, which Dr. McCloskey characterized as a "very minor looking abnormality."  (Tr. 407, 421).  Nerve conduction studies of both upper extremities showed results considered within the normal range for someone of Leger's age.  (Tr. 408).  A test which measures muscle response to nerve stimulation (EMG) revealed no abnormalities.  Id.  Dr. McCloskey referred Leger to radiologist, Dr. Charles N. Aprill, for further spinal tests.  (Tr. 409-14, 419).

Leger complained to Dr. Aprill of left neck pain and a numbing sensation of both upper extremities.  Dr. Aprill's examination of Leger revealed limited movement of the neck, tenderness of the shoulder muscles, and tenderness with palpation in the left about the mid-third of the spine.  Dr. Aprill performed a diagnostic test (arthrogram) at C5-6 which was normal, and

at C4-5 which was abnormal.  Dr. Aprill injected local anesthetic and steroid suspension into

each of the joints and performed a block at C5.  (Tr. 410).  Dr. Aprill described the initial post-

procedure response as favorable, with Leger reporting significant relief of her chronic symptoms.

Id.

In April 1998, after a review of Dr. Aprill's evaluation, Dr. McCloskey diagnosed post-

traumatic cervical syndrome due to C4-5 dysfunction on the left, chronic equilibrium problems

due to a past head injury, history of bulging disc at C5-6, and history of lumbar disc bulging.  (Tr.

416).  Dr. McCloskey stated there was no need for surgery, and said he expected Leger to make a

good recovery.  He noted her impairments would not be permanent, explaining "[Leger's] up and

about, free of deficit.  She's fully functional."  Id.

In July 1998, Dr. Whalen acknowledged Leger's neurological examination was

completely negative despite her continued complaints of pain.  (Tr. 441).  He also described her

prognosis as good.  (Tr. 440).  In November 1998, Dr. Whalen said despite Leger's multiple

trigger points, she had normal orientation, normal coordination, normal sensation, normal mood

and affect, symmetric deep tendon reflexes, and normal gait and station.  (Tr. 439).

Nevertheless, Dr. Whalen completed a Fibromyalgia Residual Functional Capacity

Questionnaire on December 7, 1998, concluding Leger's symptoms met the American

Rheumatological criteria for fibromyalgia.  He listed additional diagnoses, including chronic

fatigue syndrome, cervical and lumbar herniated discs, osteoarthritis, and vestibular dysfunction.

(Tr. 432).  He said these diagnoses were supported by multiple trigger points, decreased spinal

mobility, parasthesias in her hands and feet, and muscle spasms.  Id.  Other symptoms included

multiple tender points, non-restorative sleep, chronic fatigue, morning stiffness, muscle

7

weakness, swelling, frequent severe headaches, urinary tract infections, premenstrual syndrome, inner ear balance difficulties, numbness and tingling, difficult and painful menstruation, breathlessness, anxiety, panic attacks, depression, and chronic fatigue syndrome. (Tr. 433). Dr. Whalen described Leger's pain as constant with post-exertional exacerbation, and it was constantly severe enough to interfere with attention and concentration. (Tr. 434). Dr. Whalen opined Leger was incapable of even low-stress work because any stress would worsen her pain. Id. Dr. Whalen estimated Leger could walk four city blocks without rest or severe pain, continuously sit for five minutes, could not stand for any length of time, could sit and stand/walk for only a total of less than two hours in an eight-hour workday with normal breaks, should never stoop or crouch, and could occasionally lift and carry less than ten pounds. (Tr. 435-437). He also stated Leger would need to walk every ten minutes for about three minutes, take unscheduled breaks every two hours in an eight-hour workday to lie down for 30 to 45 minutes, and would have significant limitations in doing repetitive reaching, handling, and fingering. (Tr. 436, 437). Dr. Whalen also estimated Leger would have good and bad days, and it was likely she would miss as much as 10-15 days of work per month. (Tr. 432-437).

After being diagnosed with an inner ear balance disorder, Leger received therapy at Abington Hospital and remained generally stable by avoiding sinus congestion and certain types of motion. (Tr. 88, 473). However, following a car accident in December 1998, Leger began to experience vertigo and sought treatment with The Neurologic Group of Bucks and Montgomery County.

On January 22, 1999, Dr. Kenneth Shulman, a neurologist at the Neurologic Group, examined Leger, diagnosed vestibular dysfunction, but characterized her symptoms as "a rather

8

curious collection of symptoms that I cannot really localize" and "inconsistent." (Tr. 475). He

also noted Leger did not have many of the musculoskeletal manifestations of fibromyalgia, and

although Leger alleged left arm weakness, he did not believe there was weakness. Id.

Nevertheless, Dr. Shulman ordered an MRI of the brain and referred Leger to Dr. Jeffrey

Buckwalter for vestibular rehabilitation. Id. The MRI was unremarkable with no lesion

identified. (Tr. 478).

Dr. Buckwalter examined Leger, diagnosed vestibular vestibulitis (inflammation of the

inner ear), and recommended exercise, physical therapy, and an ENG, that is, a neurologic test

which measures fine motor movements of the eye muscles. (Tr. 480). Two months later, Dr.

Buckwalter said Leger's balance and vertigo had improved, and noted Leger's ENG was

negative. Id.

From August 1999 to June 2001, psychologist Dr. Jacques Lipetz saw Leger for

continuing issues with stress, fatigue, and family issues. (Tr. 623, 654). In August 1999, Dr.

Lipetz opined none of  Leger's psychological "problems are of sufficient magnitude to prevent

her from working." (Tr. 539).

In late August 1999, psychologist Dr. Ronald J. Karpf performed a psychological

evaluation of Leger upon request of the Commissioner. (Tr. 541). Leger denied perceptual

disturbances such as hallucinations. (Tr. 542). She had goal-directed thoughts, excellent abstract

reasoning ability as measured by proverbs, and was able to remember six digits forward, three

digits backward, and the morning events. Id. Dr. Karpf concluded Leger's anxiety and

depression were in good remission, almost in full remission, and the severity of her emotional

problems was mild to moderate.  (Tr. 543).

On November 8, 1999, orthopedist Dr. Gene D. Levin, performed a consultative evaluation of Leger upon the Commissioner's request.  (Tr. 549).  Dr. Levin characterized his findings as "rather unremarkable for objective signs," noting Leger had normal posture, ease in movement, normal lumbar flexion, and slightly limited cervical range of motion.  Id.  Leger retained full range of motion in the joints of her upper and lower extremities.  She had no gross weakness in any muscle group, negative straight leg raises, and full range of motion of the hips.  (Tr. 549-50).

In February 2000, Dr. Whalen noted decreased range of motion in Leger's back with pain and spasms in her shoulder muscles.  He prescribed a muscle relaxant (Zanaflex), heat, stretching, and occupational therapy.  In July 2000, Dr. Whalen noted decreased range of motion in the back with pain, muscle spasms, tender points on the left greater than the right, cognitive deficits, increased balance problems, and numbness in the upper back and left shoulder.  (Tr. 569-571).  He continued to prescribe chiropractic care and deep muscle therapy through July 15, 2002.  (Tr. 708-713).  Leger received aquatic physical therapy and deep muscle therapy at the Deep Muscle Therapy Center, Inc., from August 1996 through September of 2002.  Records from the Center show Leger complained of pain, swelling, stiffness, spasms, and muscle tightness in her neck, shoulders, hips, abdomen, hands, wrists, sacrum, gluteus muscles, ribs, low back and arms.  (Tr. 362-72, 457-70, 624-45, 714-15).  From October 1998 through December 2003, Leger also received chiropractic treatment from Willet B. Neff, D.C., which alleviated some of her symptoms.  (Tr. 376-91, 484-26, 578-622, 662-706, 716-80, 744-80).

10

Dr. Steven Masceri, a specialist in physical medicine and rehabilitation, examined Leger on February 7, 2002 for complaints resulting from a September 18, 2001 car accident. (Tr. 655). Dr. Masceri noted Leger's cervical spine range of motion was limited, reflexes were brisk, and strength was 4/5 throughout the upper extremities. (Tr. 656). Dr. Masceri performed an EMG on Leger's upper extremities and diagnosed mild acute disease of the nerve roots (radiculopathy) at C7/C8 on the left, and mild to moderate carpal tunnel syndrome in both wrists. (Tr. 657-661).

On April 14, 2002, Dr. Francis B. Boland, Jr., performed an orthopedic evaluation of Leger at the Commissioner's request. (Tr. 646). Upon examination, Dr. Boland noted a 25% decreased range of motion in Leger's neck, full range of motion of her upper extremities, intermittent balance problems, negative straight leg raising tests, equal and symmetric reflexes, and no motor or sensory deficits. (Tr. 646-47). Dr. Boland concluded Leger's orthopedic symptoms were normal for her age, but her fibromyalgia and vestibular difficulty were better evaluated by other specialists. (Tr. 648).

On April 30, 2002, Dr. Ketankumar Patel conducted a psychiatric evaluation of Leger at the request of the Commissioner. (Tr. 649). Dr. Patel noted Leger was well-groomed, kept good eye contact, her speech was coherent and goal-directed, her mood was mostly moderate, i.e., neither manic nor depressed, with little depression noted, appropriate affect, coherent and goal-directed thought processes, fair abstract thinking, fair intelligence, fair concentration, fair impulse control, fair judgment, fair insight, and difficulty with persistence and pace because of pain. (Tr. 650-52). Dr. Patel also noted Leger was not significantly depressed, her prognosis was fair, but her pain management should be in better control. (Tr.651).

Dr. Lawrence A. Kerson, a neurologist, examined Leger a month after an October 2003

11

car accident.  (Tr. 785-792).  Dr. Kerson noted decreased pin sense on the right side of Leger's

face, decreased vibratory sense on the left side of the face, better hearing on the right than the

left, and mild global weakness on the left.  Dr. Kerson's impression was of a closed-head injury

without loss of consciousness, as a result of the car accident, which exacerbated all of the pre-

existing symptoms.  (Tr. 785-792).  Dr. Kerson ordered an MRI on the cervical spine which was

performed on December 3, 2003 and showed a small disc bulge at the C5/6 level.[5]  (Tr. 784).

Psychologist Dianne Langberg submitted a Mental Impairment Questionnaire on

December 15, 2003, and said she had treated Leger "off and on" since 1993, but provided no

treatment notes.  (Tr. 801-05).  Dr. Langberg noted sleep disturbance; social withdrawal or

isolation; blunt, flat or inappropriate affect; decreased energy; feelings of guilt/worthlessness;

difficulty thinking or concentrating; pathological dependence or passivity; poor concentration;

and markedly limited initiative secondary to depression.  Dr. Langberg also noted Leger's

chronic pain and depression reduce her ability to concentrate, cause fatigue, and interfere with

her functioning; and her impairments would cause her to be absent from work more than three

times a month.  (Tr. 803).  Dr. Langberg's diagnosis of Leger was dysthymic disorder, i.e., a

chronic disturbance of mood characterized by mild depression or loss of interest in usual

activities.  (Tr. 805).

---

[5] As previously noted, the results of an MRI performed nine years earlier of the cervical spine were identical.  (Tr. 392).

DISCUSSION

A.  <u>Legal Standard</u>

I must determine whether substantial evidence supports the Commissioner's final decision.  42 U.S.C. § 405(g); <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005); <u>Plummer v. Apfel</u>, 186 F.3d 422, 427 (3d Cir. 1999).  The factual findings of the Commissioner must be accepted as conclusive if they are supported by substantial evidence.  <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971) (citing 42 U.S.C. § 405(g)); <u>Rutherford</u>, 399 F.3d at 552.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson</u>, 402 U.S. at 401 (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)); <u>Reefer v. Barnhart</u>, 326 F.3d 376, 379 (3d Cir. 2003).  It is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence."  <u>Rutherford</u>, 399 F.3d at 552.  I may not weigh the evidence or substitute my own conclusions for that of the ALJ.  <u>Burns v. Barnhart</u>, 312 F.3d 113, 118 (3d Cir. 2002).  If the ALJ's findings of fact are supported by substantial evidence, I am bound by those findings, even if I would have decided the factual inquiry differently.  <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001). At the same time, however, I must remain mindful that "leniency [should] be shown in establishing claimant's disability."  <u>Reefer</u>, 326 F.3d at 379 (quoting <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979)).

The Social Security Administration has adopted a system of sequential analysis for the evaluation of disability claims.  This five-step evaluation is codified at 20 C.F.R. §§ 404.1520,

416.920.[6]  A claimant is disabled if she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  20 C.F.R. §§ 404.1520, 416.920.  The claimant satisfies her burden by showing an inability to return to her past relevant work.  Rutherford, 399 F.3d at 551.  Once this showing is made, the burden shifts to the Commissioner to show the claimant, given her age, education, and work experience, has the ability to perform specific jobs that exist in the economy.  20 C.F.R. § 404.1520; see Rutherford, 399 F.3d at 551.

The ALJ may not make speculative inferences from medical evidence, see e.g., Smith v.

---

[6]  These steps are summarized as follows:

1.  If the claimant is working or doing substantial gainful activity, a finding of not disabled is directed.  If not, proceed to Step 2.  20 C.F.R. §§ 404.1520(b), 416.920(b).

2.  If the claimant is found not to have a severe impairment which significantly limits his or her physical or mental ability to do basic work activity, a finding of not disabled is directed.  If there is a severe impairment, proceed to Step 3.  20 C.F.R. §§ 404.1520(c), 416.920(c).

3.  If the impairment meets or equals criteria for a listed impairment or impairments in Appendix 1 of Subpart P of Part 404 of 20 C.F.R., a finding of disabled is directed.  If not, proceed to Step 4.  20 C.F.R. §§ 404.1520(d), 416.920(d).

4.  If the claimant retains residual functional capacity to perform past relevant work, a finding of not disabled is directed.  If it is determined that the claimant cannot do the kind of work he or she performed in the past, proceed to Step 5.  20 C.F.R. §§ 404.1520(e), 416.920(e).

5.  The Commissioner will then consider the claimant's residual functional capacity, age, education, and past work experience in conjunction with the criteria listed in Appendix 2 to determine if the claimant is or is not disabled.  20 C.F.R. §§ 404.1520(f), 416.920(f).

See also Knepp v. Apfel, 204 F.3d 78, 83-84 (3d Cir. 2000) (citing Santise v. Schweiker, 676 F.2d 925, 926-27 (3d Cir. 1982)).

Califano, 637 F.2d 968, 972 (3d Cir. 1981), but may reject conflicting medical evidence.

Williams v. Sullivan, 970 F.2d 1178, 1187 (3d Cir. 1992).  When a conflict in the evidence

exists, the ALJ may choose whom to credit, but "cannot reject evidence for no reason or for the

wrong reason."  Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993); accord Morales v. Apfel,

225 F.3d 310, 317 (3d Cir. 2000).  The ALJ must consider all the evidence and give some reason

for discounting the evidence she rejects.  See Stewart v. Secretary of H.E.W., 714 F.2d 287, 290

(3d. Cir. 1983).

Although the fact finder's credibility determinations are normally entitled to deference, I

must nevertheless exercise meaningful review.  Cao v. United States, 407 F.3d 146, 151 (3d Cir.

2005).  The reasons for credibility findings must be substantial and bear a legitimate nexus to the

finding, e.g., based on inconsistent statements, contradictory evidence, or inherently improbable

testimony.  Id.; accord St. George Warehouse, Inc. v. NLRB, 420 F.3d 294, 298 (3d Cir. 2005)

(ALJ credibility determination should not be reversed unless "inherently incredible or patently

unreasonable" as long as ALJ considers all relevant factors and explains her decision).

B.  Commissioner's Third and Final Decision

The ALJ found Leger had severe fibromyalgia and vestibular dysfunction, and non-severe

dysthymia, but none of her impairments met or equaled the severity of any of the impairments

described in the Listings.[7]  (Tr. 29, Findings No. 3 through 5).  The ALJ also found Leger's

-----

[7]  The Listing of Impairments is a regulatory device used to streamline the decision-
making process by identifying those claimants whose medical impairments are so severe they
would be found disabled regardless of their vocational background.  Sullivan v. Zebley, 493 U.S.
521, 532 (1990).  The Listing defines impairments that would prevent an adult, regardless of age,
education, or work experience, from performing "any" gainful activity, not just "substantial"

(continued...)

testimony could not be fully credited given her routine medical history.  (Tr. 30, Finding No. 6).

Finally, the ALJ found because Leger was able to perform sedentary and light work, she could

perform her past relevant work as a retail manager and telemarketer, and thus was not disabled.

(Tr. 30, Findings No. 7 through 10).

    C.  <u>Analysis</u>

    Leger argues the ALJ failed to consider the chronic pain, fatigue, and vestibular

dysfunction resulting from Leger's fibromyalgia in determining Leger's residual functional

capacity.  The ALJ considered Leger's subjective complaints of debilitating pain and symptoms,

but found they were not entirely credible.

    An ALJ must seriously consider subjective complaints, which may support a claim for

benefits, especially when the complaints are supported by medical evidence.  <u>Smith</u>, 637 F.2d at

972; <u>Taylor v. Harris</u>, 667 F.2d 412 (3d Cir. 1981); <u>see also</u> <u>Mason</u>, 994 F.2d at 1067.

Subjective complaints must bear some relationship to the claimant's physical status, as

demonstrated by objective medical findings, diagnoses, and opinion.  20 C.F.R. §§ 404.1526;

404.1529; <u>see also</u> <u>Baerga v. Richardson</u>, 500 F.2d 309 (3d Cir. 1974).

    In considering Leger's subjective complaints, the ALJ said:

> The claimant's statement concerning her impairments and their impact on her
> ability to work have not been accepted in toto in light of the degree of medical
> treatment required, the reports of the treating and examining practitioners, the

---

[7](...continued)

gainful activity.  <u>See</u> 20 C.F.R. §§ 404.1525(a), 416.925(a) (2005) (purpose of the listings is to
describe impairments "severe enough to prevent a person from doing any gainful activity").  The
Listing was designed to operate as a presumption of disability making further inquiry
unnecessary.  <u>Sullivan v. Zebley</u>, 493 U.S. at 532.

medical history, the findings made on examination, the claimant's assertions concerning her ability to work, and the claimant's own description of her activities and lifestyle.

(Tr. 25).

It is undisputed Leger has been diagnosed with fibromyalgia and vestibular dysfunction. However, the mere diagnosis of an impairment is not enough, standing alone, to qualify a claimant for benefits. Instead, the disability inquiry focuses on the severity of the claimant's impairment and whether it prevented the performance of substantial gainful employment. See Petition of Sullivan, 904 F.2d 826, 845 (3d Cir. 1990). Thus, Leger must show functional limitations resulting from her impairments which would preclude her from returning to the workforce.

Substantial evidence supports the ALJ's finding that Leger's functional limitations resulting from her impairments would not preclude her from performing sedentary and light work. For example, on her application for benefits, Leger said she cooked for herself, did the grocery shopping, dusted and vacuumed, sang in the church choir, played the tin whistle, played computer games, searched the internet, did some gardening, read extensively, drove her car almost daily, and walked 30 to 80 minutes for therapy an average of three times weekly. (Tr. 262). She also testified she had lived on her own for years before moving in with her ailing mother, prepared simple meals, played computer games, wrote professionally, visited friends, and handled her finances. (Tr. 64, 99-102, 262).

Further, medical evidence supports the ALJ's finding that Leger's complaints were not entirely credible. Dr. McCloskey described Leger as "fully functional." (Tr. 416). Dr. Shulman

17

deemed Leger's symptoms "rather curious" and "inconsistent."  (Tr. 475).  Dr. McNally said

Leger had normal passive range of motion of the cervical spine, normal strength in both upper

extremities, unremarkable neurological status in both upper extremities, normal gait, minimum

tender spots upon palpation, and her rehabilitation potential was excellent.  (Tr. 430).  Dr. Levin

stated Leger retained a full range of motion in her extremities, and had no gross weakness in any

muscle group.  (Tr. 549-50).  Dr. Boland noted Leger had a normal gait, full range of motion in

the extremities, and no motor or sensory deficits.  (Tr. 646-47).  Despite his restrictive opinion,

Dr. Whelan repeatedly found Leger had normal orientation, normal coordination, normal

sensation, normal mood and affect, symmetric deep tendon reflexes, and normal gait and station.

(Tr. 438-41, 546-48, 569-71, 708, 782).  All of the objective medical testing yielded normal

results with the exception of a small central disc bulge and age-appropriate degenerative disc

disease.

        Finally, the ALJ cited other inconsistencies in assessing Leger's credibility.  For example,

Leger's claims of disabling symptoms were inconsistent with her demeanor at the hearing where

she was alert, articulate, cheerful, and without any visible signs of discomfort much less in severe

pain throughout the entire ninety-minute hearing.  (Tr. 28).  Credibility findings based on such

factors merit special deference to the finder of fact, who observed the witness first-hand.  See

Cao, 407 F.3d at 151.  The ALJ also noted Leger's treatment for these allegedly disabling

impairments was de minimis.  Id.  Leger relied mainly on chiropractic care and routine non-

narcotic medications for relief of her alleged pain, not the type of treatment one would expect for

a claimant in constant unremitting pain and discomfort.  Id.  In addition, the ALJ noted despite

Leger's complaints of severe vertigo, her driver's license had never been suspended by medical

18

advice.  Id.

Accordingly, contrary to Leger's assertion, the ALJ gave appropriate weight to Leger's subjective complaints resulting from her fibromyalgia in finding that she could perform her past relevant sedentary and light work.

Leger also argues the ALJ accorded no weight to Dr. Whalen's opinion that Leger was disabled due to her severe impairments.  Leger also says the ALJ failed to address Dr. Whalen's voluminous treatment notes.

A treating physician's opinion is entitled to controlling weight when it is supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record.  See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Although the treating physician's conclusion should be accorded great weight, it may be rejected if it is unsupported by sufficient clinical data,  Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985), or contradicted by other medical evidence.  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999). "While the ALJ is, of course, not bound to accept physicians' conclusions, she may not reject them unless she first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected."  Kent v. Schweiker, 710 F.2d 110, 115 n.4 (3d Cir. 1983).  Thus, the ALJ may choose to reject a treating physician's assessment if it conflicts with other medical evidence, the ALJ clearly explains her reasons for rejecting the assessment, and she makes a clear record of her decision.  See generally Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991); Rivera v. Barnhart, 2005 WL 713347 at *5 (E.D. Pa. March 24, 2005) (Giles, C.J.) (collecting authorities).

19

Leger claims the ALJ's failure to give controlling weight to Dr. Whalen's highly restrictive opinion, and to discuss each of Dr. Whalen's treatment notes is error.  Because the ALJ incorporated by reference the findings and discussion of the previous ALJ into her own decision, Leger's assertions are meritless.[8]  (Tr. 26).  Leger cites no legal authority that precluded the ALJ from referencing findings of the prior ALJ.

The previous ALJ found Dr. Whalen's highly restrictive opinion was not entitled to the controlling weight generally accorded treating physicians because it was inconsistent with the record as a whole, and because it gave full credit to Leger's subjective complaints and self-reported limitations which were not supported by the objective medical tests revealing generally normal, and at most, mild findings.  (Tr. 40, 142).

The ALJ's findings are supported by substantial evidence.  For example, Dr. Whalen's opinion is inconsistent with Leger's testimony that she prepared meals, went shopping, dusted, vacuumed, sang at church, played computer games, used the internet, wrote professionally, visited friends, and drove.  (Tr. 40, 262).  The opinion is also inconsistent with the evidence of other examining physicians who said Leger was fully functional; moved with ease; had normal strength, normal coordination, normal sensation, normal mood and affect, symmetric deep tendon reflexes, and normal gait and station; and retained a full range of motion in her extremities.  (Tr. 430, 438-41, 546-48, 549-50, 569-71, 647, 708, 782).  Moreover, all of the many objective tests performed had normal results with the exception of a small disc bulge and age-appropriate degenerative disc disease.  I have already determined the ALJ properly discounted Leger's

---

[8]  The ALJ incorporated by reference the findings of the previous ALJ regarding the medical records submitted to the Commissioner as of October 31, 2002.  (Tr. 26, 35-43).

20

subjective complaints which were inconsistent with the record.  Insofar as Dr. Whalen's opinion was based on those unsupported subjective complaints, and because the opinion was inconsistent with the record as a whole, it is not entitled to controlling weight, and the ALJ properly discounted it.  See Newhouse, 753 F.2d at 286; see also Plummer, 186 F.3d at 429.

Leger also contends the ALJ failed to consider whether Leger could sustain work on a regular and continuing basis, as required by Social Security Ruling 96-8P.[9]  The only evidence which even suggests Leger would not be able to sustain work on such as basis is the discounted opinion of Dr. Whalen, which stated Leger could sit and stand/walk only for a total of less than two hours in an eight hour work day, she would need to take unscheduled breaks every two hours in an eight-hour workday to lie down for 30 to 45 minutes, and she would likely be absent from work due to illness as much as 10-15 days per month.  (Tr. 432-437).  As discussed above, the ALJ properly discounted this opinion as inconsistent with the record as a whole, and as improperly based on Leger's unsupported subjective complaints.  No other evidence establishes Leger would not be able to sustain work on a regular and continuing basis, i.e., eight hours a day, and five days a week, or an equivalent work schedule.

Leger also argues the ALJ failed to include appropriate limitations in the hypothetical questions posed to the vocational expert.  She contends the ALJ did not inquire about the effect

---

[9] SSR 96-8P provides:

> Ordinarily, the residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the residual functional capacity assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

the non-exertional impairments of pain and fatigue would have on Leger's ability to work.

Testimony of a vocational expert constitutes substantial evidence for purposes of judicial review where a hypothetical question considers all of a claimant's impairments which are supported by the medical record.  Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987); see also Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (an ALJ is not required to submit to the vocational expert every impairment alleged by a claimant; instead, the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations);  Ramirez v. Barnhart, 372 F.3d 546, 552 (3d Cir. 2004) (the hypothetical need only reflect all of a claimant's impairments that are supported by the record).

First, it was unnecessary for the ALJ to rely on the testimony of the vocational expert in this case.  If a claimant survives step four of the sequential analysis, the fifth step requires the ALJ to consider "vocational factors" (the claimant's age, education, and past work experience) and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.  Ramirez, 372 F.3d at 551 (quoting 20 C.F.R. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c)).  Here, Leger did not survive the fourth step.  The ALJ terminated her analysis at the fourth step where she found Leger retained the residual functional capacity to return to her past relevant work.  Thus, there was no need to seek expert testimony regarding Leger's ability to perform alternative employment.

Even assuming the ALJ was somehow required to pose hypothetical questions to a vocational expert at step four of the sequential analysis, Leger's claim fails.  The ALJ was not required to include Leger's limitations of chronic pain and fatigue into a hypothetical question

because the ALJ had properly found those limitations were not credibly established.  <u>See</u> <u>Rutherford</u>, 399 F.3d at 554.

Accordingly, I make the following:

**R E C O M M E N D A T I O N**

AND NOW, this      23rd         day of August, 2006, IT IS RESPECTFULLY RECOMMENDED plaintiff's motion for summary judgment be DENIED, and defendant's motion for summary judgment be GRANTED.

BY THE COURT:

 /s/ Timothy R. Rice
TIMOTHY R. RICE
U. S. MAGISTRATE JUDGE